**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 26 CR 338 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Gabriel A. Fuentes |
| ALEXANDER INIGUEZ MERCADO, | ) | |
| | ) | District Judge John Robert Blakey |
| Defendant. | ) | |

## DETENTION ORDER

The magistrate judge, by authority of 28 U.S.C. § 636(a)(2), held a detention hearing in this matter on the government's opposed motion ("Detention Motion"; D.E. 3) to detain Defendant Alexander Iniguez Mercado ("Defendant") pending trial on a charge of obstruction of justice in violation of 18 U.S.C. § 1519. At the hearing, the Court heard oral argument from the government and Defendant, by his appointed counsel with the Federal Defender Program. For the reasons stated below, the Court grants the Detention Motion, finding that the government met its burden of establishing, by clear and convincing evidence, that no release conditions or set of conditions based on the record at this time would reasonably assure the safety of the community or any other person.

## BACKGROUND

The indictment (D.E. 1) charges Defendant with obstructing justice in connection with an alleged plan to attack an "Ultimate Fighting Championship" event ("the UFC Event") scheduled to take place at or near the White House on June 14, 2026. Indictment, passim. According to the indictment, at some time before the event, the Federal Bureau of Investigation "obtained information that defendant MERCADO was a member and an administrator of certain Signal

messaging groups that included members who appeared to communicate with others regarding the planned UFC Event attack." Indictment ¶ 1(e). The indictment is a formal accusation associated with a finding of probable cause by the grand jury that returned the indictment, and for all purposes, Defendant is presumed innocent until proven guilty. The indictment alleges that on June 13, the day before the UFC Event, an FBI agent contacted Defendant by phone, informed him that the call concerned threats made online regarding the UFC Event, and asked him whether he planned to travel to Washington, D.C., to help with an attack. *Id.* ¶ 13(f). The indictment further charges that the obstruction offense occurred when Defendant uninstalled the Signal app (an encrypted, device-to-device messaging platform that does not keep the messages on a central server but leaves them only on the devices) from his phone device between June 13 and 14 so that the electronic data on his phone was altered, destroyed, or concealed. *Id.* ¶ 2. The government also proffered at the hearing that after receiving the call from the FBI, Defendant contacted an unnamed, alleged co-conspirator to tell that person of the FBI investigation, and that such person was, according to the government, a "high-ranking" member of the scheme.

## ANALYSIS

The Court renders no opinion on the merits of these allegations but only assesses them, along with the government's on-the-record detention hearing proffer, for the purposes of determining whether release conditions exist to reasonably assure appearance in court or safety of the community or any other person, upon an application of the four statutory factors per 18 U.S.C. § 3142(g). As for nonappearance risk, the Court ultimately determined that it was not making findings, given that the Court's findings that the government met its burden on the community safety prong were sufficient to support this Detention Order per Section 3142(e). The factorial

2

analysis went as follows, with this order incorporating by reference the statements the Court made orally in granting the Detention Motion at hearing:

*Nature and Circumstances of the Offense*

The nature and circumstances of the charged offense give it a high degree of seriousness, insofar as it involves at least a tangential connection to an alleged plot to inflict mass casualties at a high-profile, highly secured event to be attended by the President of the United States at the very seat of the Executive Branch of the government, i.e., the White House. If the government's allegations are true, that would be a dastardly, vicious attack intended to terrorize and cause injury or death to persons at the White House and damage to its physical situs, but also to shake the sense of security of all Americans, and their confidence in the ability of the nation to keep the public and its elected and appointed executive leadership safe. The parties were heard at great length at the hearing, and the defense argued that none of Defendant's chatter about a White House attack was serious, in that Defendant was simply a "concerned citizen" who had communicated with other like-minded people who were "not happy with the way things were going in the country." Further, Defendant by counsel argued that he is a mere "LARP-er," a term said to refer to "live action role playing," in which the participants are not serious about the matters they discuss with each other – they are only playing roles. The Court also reviewed a significant volume of exhibit evidence (Government Exhibits 1-5) which were admitted for purposes of the detention hearing and which were ordered to be released publicly with a few selected redactions. Those redacted exhibits are also to be filed on the docket. Needless to say, the exhibits contain chats or messages attributed to the Defendant (including by his own admission to the FBI in post-arrest interviews, the government proffered), and several of those messages refer to matters including a "raid" on Walmart stores to obtain equipment for supposed "survivalism," efforts to obtain firearms, and an

approving response to a message from another user encouraging fatal attacks on law enforcement members as they slept in hotel rooms. Some of the messages referred to the UFC Event as only the beginning of a series of events including an attack on July 4, the nation's 250th birthday. There are references to disagreements with national policies in matters such as the Iran War, and defense counsel focused on the least concerning of those (attributing them to an interest in "survivalism") to associate his client with constitutionally protected protest.

The government nonetheless proffered that Defendant admitted, in post-arrest statements to the FBI, that he served as an "administrator" for a Signal group chat that became the subject of the FBI investigation. The parties disagreed as to what degree of involvement or leadership Defendant had in this group, or whether there was any one clear leader, but the government proffer included admissions that Defendant's role in the Signal group was to recruit and even vet potential members by placing them into waiting rooms until they completed a sort of questionnaire or application that Defendant would review, rejecting or accepting applications, and then sometimes ejecting some of the later. The defense proffered that all of these activities, were, in a way, part of the role-playing game, and that administrator, Defendant did not exercise a leadership role and in any event was a mere "LARP-er." As the Court commented at the detention hearing, the weight the Court might place in that assertion for today's purposes depends heavily on Defendant's credibility and any corroboration for that assertion, and at this point the record is bereft of corroboration. Defendant's credibility came under fire during the detention hearing: The government's proffer included an assertion that Defendant told FBI that he uninstalled the Signal app from his phone the next morning (after July 13) at the instruction of his mother, whereas an FBI forensic analysis showed that the de-installation occurred moments after the end of the July 13 call with the FBI. The Court was left with a concern about Defendant's credibility, an issue

4

that need not be resolved now, but that was significant enough to undermine, for purposes of the Court's Bail Reform Act risk analysis, Defendant's assertion that he poses little or no community risk because he is a mere "LARP-er" and not anyone serious about committing a mass terror attack.

And taken as a whole, the volume and tenor of the communications in Exhibits 1-5 were, in a word, highly concerning if not horrifying, and when they are compared with the arguments the defense made about their harmlessness, the Court could not conclude that the risks to be posed to community safety by release should be considered reduced or lessened (by the defense arguments) to a degree that could have prevented the government from persuading the Court by clear and convincing evidence that no release conditions can reasonably assure community safety on this record.

*Weight of the Evidence*

The weight of the evidence, supported by the grand jury indictment's finding of probable cause and Exhibits 1-5, is strong, and that might not be the least important factor here, given the concerns the Court expressed about the nature and circumstances of the offense playing a major role in the detention determination.

*History and Characteristics of the Person*

This factor weighed in Defendant's favor because of his minimal criminal history and relative youth. But it was not enough to outweigh the impact of the other three factors.

*Impact of the Release on Community Safety*

For the reasons stated above, the Court again found the communications proffered in Exhibits 1-5, along with the offense's alleged connection to a broader alleged plot to carry out a mass-casualty offense at the White House, to be so serious that this factor weighed in favor of detention on the community safety prong.

5

**CONCLUSION**

For the foregoing reasons, the Detention Motion is granted upon the Court's findings that the government met its burden of establishing by clear and convincing evidence, that no release conditions will reasonably assure community safety. No findings are made as to non-appearance risk.

**SO ORDERED.**

ENTER:

_____
**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**Dated: June 30, 2026**